**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**PETER LEWIS**                                    **CIVIL ACTION**

**VERSUS**                                         **NO. 09-3240**

**BURL CAIN**                                      **SECTION "F"(5)**


## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. §636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §2254(e)(2).[1] For the following reasons, it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

---

[1] Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

I.  <u>PROCEDURAL BACKGROUND</u>

The petitioner, Peter Lewis, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On May 6, 2002, petitioner, along with Clayton Weaver and Stanley Stirgus, was charged by indictment with second degree murder, in violation of LSA-R.S. 14:30.1.  Petitioner pled not guilty to this charge on the following day.  On August 11, 2003, another indictment was filed, adding Sarah Harris as a co-defendant.[2]

On March 1, 2004, petitioner and Weaver were re-arraigned, pled not guilty and, together, proceeded to trial.  Petitioner filed a motion to suppress a photographic lineup, which was denied on March 3, 2004.  Thereafter, on March 9, 2004, the jury returned a verdict of guilty as charged as to both petitioner and Weaver.

On March 11, 2004, petitioner filed his first motion for new trial.  A second motion for new trial was filed on April 21, 2004.  On May 26, 2004, the trial court denied petitioner's motions for new trial and sentenced him to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. An out-of-time appeal was granted on November 4, 2004.

---

[2]The charge against Sarah Harris was later dismissed.

On November 29, 2005, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence, but remanded the matter with instructions that the trial court was to properly inform petitioner of his prescriptive period for purposes of seeking post-conviction relief.  State v. Lewis, 917 So.2d 583 (La. App. 5 Cir. 2005).  On December 15, 2006, the Louisiana Supreme Court denied petitioner's writ application.  State v. Lewis, 944 So.2d 1277 (La. 2006).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief.  His efforts in this regard culminated on February 6, 2009, when the Louisiana Supreme Court denied his writ application.  State ex rel. Lewis v. State, 999 So.2d 772 (La. 2009).

On March 23, 2009, petitioner filed the instant federal habeas corpus petition, raising the following claims: 1) He was denied his Sixth and Fourteenth Amendment right to a fair and impartial trial when the trial court allowed the State to produce hearsay testimony in violation of Crawford v. Washington, 541 U.S. 36 (2004); and, 2) He was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel when trial counsel erroneously instructed him to state for the record that he did not wish to present a defense in violation of Strickland v. Washington, 466 U.S. 668 (1984).  The State, in its Response (rec. doc. 10, p. 3), does not contest the timeliness of the instant action, but does

claim that petitioner, with respect to "a subclaim in claim one,"
has failed to exhaust his state court remedies as required under
Rose v. Lundy, 455 U.S. 509 (1982). However, the court chooses not
to dismiss the allegedly unexhausted claim without prejudice to
allow for its exhaustion because said claim is without merit.
Under the provisions of 28 U.S.C. §2254(b)(2), "[a]n application
for a writ of habeas corpus may be denied on the merits,
notwithstanding the failure of the applicant to exhaust the
remedies available in the courts of the State."

II.  FACTS[3]

In the early morning hours of September 14, 2001, Ralph
Sterling, also known as "Big Man," was killed at 324 Ruby Street,
Apartment B.  When the homicide occurred, Shirley Johnson, Brandon
Harris, Sarah Harris, and three children were inside the residence.

On the scene, Detective Donald Clogher spoke to Shirley
Johnson who advised him that three suspects entered the apartment,
went upstairs and shot Ralph.  Shirley Johnson identified Stanley
Stirgus as one of the perpetrators.  She said she knew him from the
neighborhood and he had attempted to ask her out on several
occasions prior to the incident.  Deputy Allen Joanos spoke with
Sarah and Brandon Harris on the scene, and he was advised that the
suspects were three armed black males with their faces covered.

---

[3] The facts noted hereinafter are as set forth by the state appellate
court in connection with Lewis' direct appeal.  State v. Lewis, 917 So.2d
583, 587 (La. App. 5 Cir. 2005).

According to Deputy Joanos, the witnesses stated that they did not know the suspects.

Shirley, Brandon and Sarah were relocated to the Detective Bureau and were individually interviewed. Detective Clogher took a statement from Brandon who identified Stirgus in a photographic lineup. Brandon knew Stirgus because he had seen him around the neighborhood. Brandon did not give a description of the other two suspects.

Sergeant John Drury took Shirley from the scene to the Detective Bureau at approximately 4:30 a.m. and, at about noon on this day, she gave a statement. Shirley initially stated that the three perpetrators were wearing masks; however, she quickly reverted back to what she had told Detective Clogher at the scene, that is, they were not wearing masks. Although Shirley could only provide Stirgus's first name and where he lived, she described the other two perpetrators and explained that she had seen them prior to the incident. Shirley was shown a photographic lineup, and she identified Stirgus. She returned to the Detective Bureau on the following day and viewed two additional photographic lineups of the victim's associates who lived in the immediate area. In addition to identifying Weaver, she identified petitioner as someone who participated in the murder at the apartment.

When Detective Meunier interviewed Sarah, she initially maintained that all three suspects were masked. However, she

subsequently was shown photographic lineups and identified Stirgus, Weaver and petitioner.

      At trial, Shirley Johnson testified that she was a friend of the victim, who was dating Sarah.  At the time, she was living in the apartment at 324 Ruby Street with her sister, who was working offshore at the time of the incident.  Sarah's brother, Brandon, also lived with them.  On the night of the murder, Shirley was at the apartment in a room with her two nieces, who were asleep, and her nephew, who heard knocking at the door.  When Shirley went downstairs, she first saw petitioner, who she knew lived across the street.  She also observed Weaver, whom she knew from hanging around with petitioner.  Also, she knew the third person, Stirgus.

      Shirley testified that Weaver and petitioner were armed, and that petitioner had some kind of machinegun.  When she saw them, she turned around to run back upstairs while screaming for Sarah. At this time, Weaver grabbed her leg, petitioner put a gun to her head, and she was told to go into a room.  Stirgus went into the room with Shirley and the children.  Petitioner and Weaver were in her sister's room with Ralph and Sarah.  Petitioner was demanding money and car keys from Ralph.  Shirley heard seven gunshots, and the three perpetrators then ran out.  She testified that none of the perpetrators were wearing masks, but she explained that she initially told the police they were wearing masks because

Sarah had told her to. She testified that she was scared and thought they might come back for her.

Brandon testified that he knew the victim and was in the house when he was killed. That night, he was sleeping on the sofa downstairs when he awoke and saw Stirgus walk by. Although Stirgus attempted to cover his face, Brandon recognized him and saw some tattoos on his arm. He saw no one else. While dozing back off to sleep, he then heard screaming. Because he heard Sarah screaming seconds after he saw Stirgus walk by, he agreed that someone else must have gone upstairs before Stirgus. He recalled hearing the victim state, "I'm going to give it to you, Chief" before he ran down the street to his sister's house to call the police. Brandon admitted that the victim was a drug dealer.

After the police received information that Sarah was possibly involved, she was arrested and charged with the murder. At trial, Sarah, who was granted immunity by the State, testified that she knew the victim, but she then pled the Fifth Amendment and refused to answer questions. Thereafter, portions of her previous testimony from a motion to suppress hearing held on February 7, 2002 were read into the record.

In this testimony, Sarah stated that when her boyfriend, Ralph Sterling, was murdered, she was inside the apartment with Ralph, her brother, Shirley and a couple of children. Sarah stated that she had given a statement to the police and that later on that

day, she viewed some photographs. Sarah was then cross-examined by Weaver's counsel. She admitted that she called the police and when the detectives arrived, she told them that the three suspects were wearing ski masks, because she was afraid. Thereafter, she told them that they were not wearing masks. She stated that Stirgus, whom she identified by photograph, was pointing a gun at her when she woke up. She said two people were in the room and they both had guns. The third person, whom she identified as Weaver, glanced in the room while holding a machinegun, but she did not see him at any other time during the incident. She wrote on the back of the photograph which she identified as Weaver that "[h]e took the kids in the room." She testified that Stirgus told Ralph to give them all the money, so she got the money and handed it to Stirgus, as directed by Ralph. After Ralph and Stirgus went into the bathroom, she heard gunshots. Thereafter, the suspects ran out of the apartment.

At trial, Stirgus, who was granted immunity by the State, also refused to testify and pled the Fifth Amendment. Thereafter, his five taped statements made to Detective Meunier on September 16, 2001 were played, and a transcription of each was given to the jury. Stirgus's first statement was exculpatory and provided information as to where he purportedly was at the time of the incident. He claimed he did not know the victim.

In his second statement, Stirgus admitted that he was in the apartment when the victim was shot, but that he remained downstairs. He stated that he thought they were just going to visit the victim. He admitted that he knew the other two men were armed with what looked like a machinegun and a nine millimeter, but he stated that he did not have a gun. He heard more than two gunshots and left.

In Stirgus third statement, he noted that he had just been shown a lineup and identified "Dough Boy" as the person who was in the apartment armed with a machinegun. He then stated that he was shown a second lineup in which he identified someone he called "Red" who was in the apartment armed with a nine millimeter. When speaking of Red, Stirgus stated, "he (inaudible) the shooter."

Stirgus admitted in his fourth statement that he went upstairs, but he was in another room with Shirley and the children. He stated that he ran after he heard the gunshots.

In Stirgus fifth statement, he claimed that a few days before the incident, Dough Boy was talking about a "lick" (strong arm or robbery) of a man with five or six keys (kilos of dope) and twenty two thousand dollars. He stated that he needed help and he heard Big Man's name mentioned. Stirgus was later told that if he watched someone, he would get four quarters (dope). Stirgus knew that the other two men were armed that night. He was told to go in the room and watch Shirley and the children. He realized what was

going on once they threw open the door, heard a couple of things and then heard gunshots. He claimed that he did not realize there was going to be a murder, but he knew there would be a strong arm for dope and/or money.

Susan Garcia, an expert in forensic pathology and qualified to give opinions with regard to cause and manner of death, performed an autopsy. She determined that the cause of death was a gunshot wound to the chest and the manner of death was homicide.

III. <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States."  28 U.S.C. §2254(d)(1).  The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

IV.  ANALYSIS

A.  Admission of Hearsay Evidence

1. Out-of-Court Statements of Stanley Stirgus and Motion Hearing Testimony of Sarah Harris

Petitioner claims that he was denied his Sixth Amendment right of confrontation by virtue of the trial court's admission of out-of-court statements of Stanley Stirgus and motion hearing testimony of Sarah Harris. Specifically, Stirgus provided five audio-taped statements to police which were played to the jury after Stirgus pled the Fifth Amendment.[4] Harris's testimony from a February 7, 2002 motion hearing, a hearing at which neither petitioner nor his counsel were present, was read into the record after Harris refused to testify at trial.[5]

Petitioner raised this same claim on direct appeal. In addressing said claim, the Louisiana Fifth Circuit Court of Appeal first examined applicable law.

> The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. art. I, §16; State v. Robinson, 01-0273 (La.5/17/02), 817 So.2d 1131, 1135. Confrontation means more than the ability to confront the witnesses physically. Its main and essential purpose is to secure for the opponent the opportunity of cross-examination. Id. Cross-examination is the primary means by which to test the believability and truthfulness of testimony and has traditionally been used to impeach or discredit witnesses. Id.; State v. Williams, 04-608 (La.App. 5

---

[4]All direct references to petitioner were redacted from the taped statements before they were played for the jury.

[5]All references to petitioner were redacted from the motion hearing transcript.

Cir. 11/30/04), 889 So.2d 1093, 1100, <u>writ</u> <u>denied</u>, 05-0081 (La.4/22/05), 899 So.2d 559.

> In <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court discussed the Confrontation Clause and held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. <u>See</u> <u>also</u> <u>State v. Arita</u>, 04-39 (La.App. 5 Cir. 3/1/05), 900 So.2d 37, 45. In <u>Crawford</u>, <u>supra</u>, the State sought to admit the recorded statement of the defendant's wife which was made during police interrogation as substantive evidence against defendant. The wife did not testify at trial because of the spousal privilege. In <u>Crawford</u>, the Supreme Court clarified that a statement given to police during a custodial interrogation is only admissible where the declarant is unavailable and there was a prior opportunity to confront the witness.

<u>Lewis</u>, 917 So.2d at 592 (footnote omitted).

Applying the above law to the applicable facts, the state appellate court determined that the trial court's admission of Sturgis's out-of-court statements and Harris's hearing testimony did constitute a violation of petitioner's Sixth Amendment right to confrontation under the dictates of <u>Crawford</u>.[6] However, the court determined that petitioner was not entitled to relief because the violation constituted harmless error. With respect to Sturgis's statements, the court reasoned:

---

[6]The <u>Crawford</u> decision was handed down by the United States Supreme Court on March 8, 2004, which was the final day of testimony in petitioner's trial.

> [W]e find that even without the prior out-of-court
> statements made by Stirgus to the police, the evidence
> presented by the State was sufficient to support
> [petitioner's] conviction. In particular, Stirgus'
> statements implicate individuals he called Red and Dough
> Boy. No connection was presented to the jury to indicate
> [petitioner] was the individual whom Stirgus called Dough
> Boy or that Weaver was the individual he referred to as
> Red. Further, Sturgis' statements were cumulative in
> nature and were corroborated by other testimony.
>
> Shirley [Johnson] and Sarah [Harris] identified
> [petitioner] by photographic lineup. Shirley testified
> that petitioner and Weaver were in the room with Ralph
> [Sterling] and Sarah, she heard [petitioner] demanding
> money and keys from Ralph, and then she heard gunshots.
> From Shirley's testimony alone, the jury could have
> believed that [petitioner] was involved in the execution
> of this crime.
>
> [Petitioner] contends that Stirgus' fifth statement
> informed the jury of the planning of the robbery or
> burglary in advance. However, the jury could have
> already reasonably inferred that it was planned in
> advance and that [petitioner] knew the purpose of
> confronting the victim, a drug dealer, in the early
> morning hours armed with a gun.

Lewis, 917 So.2d at 594.

In connection with the erroneous admission of Sarah
Harris's hearing testimony, the Louisiana Fifth Circuit concluded:

> [T]he guilty verdict was surely unattributable to the
> error. It does not appear that Sarah's testimony was of
> great importance, especially since any references made to
> [petitioner] were redacted. Further, the State presented
> a strong case based on the eyewitness testimony of
> Shirley [Johnson].
>
> [Petitioner] argues that Sarah's previous testimony
> bolsters Shirley's testimony. Although some of Sarah's
> testimony was cumulative of other testimony presented at
> trial, contrary to [petitioner's] argument and to his
> benefit, some of Sarah's testimony contradicts the
> testimony of other witnesses, including Shirley.

<u>Lewis</u>, 917 So.2d at 595.

It is well-established that "Confrontation Clause violations are subject to harmless error analysis." <u>Fratta v. Quarterman</u>, 536 F.3d 485, 507-508 (5th Cir. 2008) (citations omitted); <u>see also</u> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986). In <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), the Court addressed the issue of harmless error in the context of habeas review, determining that collateral relief is not warranted absent a showing of "actual prejudice." The specific test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Id</u>. (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 766 (1946)).

A review of the admissible trial evidence makes clear that the trial court's error in admitting Sturgis' out-of-court statements and Harris' hearing testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." As the Louisiana Fifth Circuit observed, both Shirley Johnson and Sarah Harris identified petitioner in a photographic lineup. Further, Shirley Johnson testified that on the night of the murder, she went downstairs to see who was knocking on the door and saw petitioner in the house with a gun in his hand. (State rec., vol. 10, pp. 407, 409). She explained that petitioner was not wearing a mask and she knew him because he lived across the street. (State rec., vol. 10, p. 407). She stated that petitioner put a gun

15

to her head and she was instructed to go to her room. (State rec., vol. 10, p. 410). Thereafter, Shirley Johnson heard petitioner tell the victim to give him the money and the keys to the car. (State rec., vol. 10, p. 411). Ms. Johnson recounted that the victim was handing over the keys and the money, but shots were being fired. She heard a total of seven gunshots. Thereafter, petitioner, along with two other perpetrators, ran from the house. (State rec., vol. 10 p. 412). At trial, Ms. Johnson identified petitioner as one of the murderers. (State rec., vol. 10, p. 423).          Based upon the above, the court finds that the state appellate court's determination that the violation of petitioner's Sixth Amendment right of confrontation amounted to harmless error, does not represent an unreasonable application of Supreme Court law to the facts of this case. The trial court's error in admitting Sturgis' out-of-court statements and Harris' hearing testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." Accordingly, petitioner's claim for federal habeas corpus relief is without merit.

### 2. Hearsay Testimony of Police Detectives

In his supporting memorandum, petitioner makes a brief reference to hearsay testimony elicited from Detectives Thurman and Meunier, alleging that the admission of this hearsay testimony was violative of his right to confrontation and the rule enunciated in Crawford, supra. (Rec. doc. 3, pp. 8-9). Petitioner raised this

same argument in connection with his state post-conviction application. The state district court, in addressing the instant claim, provided:

> The petitioner's first claim is that a confrontation clause violation occurred during trial. He argues that hearsay testimony was admitted into evidence in violation of the rule established in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In <u>Crawford</u>, the Supreme Court held that hearsay statements may be admitted in a criminal trial only when the declarant is unavailable to testify and the defendant has been afforded an opportunity to cross-examine the declarant.
>
> Specifically, the petitioner complains prosecutors elicited hearsay testimony from two police detectives. It does not appear likely that <u>Crawford</u> is truly at issue. The court need not make that determination, however, because the state raises a procedural objection, which the court must first rule upon.
>
> The State argues that this claim is barred from post-conviction review because the claim was not presented on direct appeal. Under the clear language of LSA-C.Cr.P. art. 930.4, an application for post-conviction relief may be denied if it raises a claim which the petitioner raised in the trial court but inexcusably failed to raise on appeal. The state specifically points out that the petitioner's experienced appellate attorney did raise specific <u>Crawford</u> claims on direct appeal.
>
> In its opinion on appeal, the Court addresses <u>Crawford</u> challenges to co-defendant Stirgus' testimony, as well as the witness Sarah Harris. <u>Lewis</u> at 593. The Court found harmless error in light of the other evidence, including the direct, eyewitness testimony of Shirley Johnson.
>
> This court concludes that the petitioner's new <u>Crawford</u> claim relating to the police detectives' testimony is procedurally barred. This claim was known and could have been and should have been raised on direct

appeal.  Under the dictates of LSA-C.Cr.P. art. 930.4, this post-conviction challenge comes too late.

State v. Lewis, No. 01-4930 (24th Judicial District Court, December 18, 2007)(unpublished opinion).[7]

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment.  Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)).  This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.  Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.  Harris, 489 U.S. at 263; Glover, 128 F.3d at 902.  When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal

_____

[7]A copy of the district court's unpublished December 18, 2007 opinion is contained in the State rec., vol. 5 of 14, tab 5.

claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802 (1991).

For this state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. <u>Amos</u>, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. <u>Glover</u>, 128 F.3d at 902. A state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief. <u>Id</u>.

In the instant matter, both the state district court and the state appellate court issued reasoned opinions, denying, pursuant to La.C.Cr.P. art. 930.4, petitioner's challenge to the trial court's admission of hearsay testimony by Detectives Thurman and Meunier.[8] Article 930.4 has been recognized as an independent and adequate state procedural ground barring federal habeas corpus relief. See <u>Rose v. Prince</u>, 2009 WL 2922801, *4 (E.D. La. Sept. 10,

---

[8]The state district court's opinion in this regard is contained in the State record, vol. 5 of 15, tab 5. The state appellate court's opinion in this regard is contained in the State rec., vol. 14 of 14, tab 11.

2009) (Vance, J.).  When the state court relies on this procedural default in dismissing the claim, as it did here, the claim is immune from federal review.  <u>Id</u>.

A federal habeas petitioner, however, may be excepted from the procedural default rule if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice."  <u>Glover</u>, 128 F.3d at 902 (citing <u>Coleman</u>, 501 U.S. at 731-32); <u>Amos</u>, 61 F.3d at 338-39 (citing <u>Harris</u>, 489 U.S. at 262; <u>Engle v. Isaac</u>, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).  The mere fact that petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.  <u>Id</u>. at 486.

In this case, petitioner has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana courts.  Further, this court's review of the record does not support a finding that any factor external to the defense prevented petitioner from raising the instant claim in a procedurally proper manner.  The record also does not reflect any

action or inaction on the part of the State which prevented petitioner from doing so.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." <u>Hoque v. Johnson</u>, 131 F.3d 466, 497 (5th Cir.1997) (citing <u>Engle</u>, 456 U.S. at 134 n. 43). Having failed to show an objective cause for his default, the court need not determine whether prejudice existed, and petitioner has not alleged any actual prejudice. <u>Ratcliff v. Estelle</u>, 597 F.2d 474 (5th Cir.1979) (citing <u>Lumpkin v. Ricketts</u>, 551 F.2d 680, 681-82 (5th Cir.1977)).

The instant claim is therefore procedurally barred from review by this federal habeas corpus court absent a showing that a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed. <u>Hoque</u>, 131 F.3d at 497 (citing <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992)). To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence." <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 454 (1986); <u>accord Murray</u>, 477 U.S. at 496; <u>Glover</u>, 128 F.3d at 902. To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to his guilt. <u>Campos v. Johnson</u>, 958 F.Supp. 1180, 1195 (W.D. Tx.1997)

(footnote omitted); <u>Nobles v. Johnson</u>, 127 F.3d 409, 423 n. 33 (5th Cir. 1997), <u>cert</u>. <u>denied</u>, 523 U.S. 1139 (1998) (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.") When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. <u>Glover</u>, 128 F .3d at 903.

Petitioner does not present and the record does not contain evidence that suggests his actual innocence. Accordingly, petitioner has failed to overcome the procedural bar to the instant claim. As such, the claim is procedurally barred and must be dismissed with prejudice for that reason.

B.  Ineffective Assistance of Counsel

Petitioner argues that counsel was ineffective in failing to call his mother, Damita Dunmore, his brothers, Robert Henry and Damon Dunmore, and his girlfriend, Tammy Fell, as witnesses because they could have provided him with an alibi by testifying that petitioner was in Baton Rouge at the time of the murder. Petitioner further charges that counsel was ineffective in failing to investigate nicknames, such as "Chief" and "Hick", which the victim allegedly used in speaking to the perpetrators before he was murdered, and in failing to investigate the identify of "Red" and "Dough Boy", two names provided by Stirgus in identifying the two

22

guys with him on the night of the murder. (Rec. doc. 3, p. 20).

According to petitioner, counsel should have investigated to see if

such individuals actually existed and, as such, could have been the

actual persons who murdered the victim. Rather than attempting to

find these witnesses, trial counsel improperly convinced petitioner

to state on the record "that he did not want a defense, i.e., to

present witnesses." (Rec. doc. 3, p. 19).

Petitioner raised this same claim in connection with his

state post-conviction application. In addressing the matter, the

state district court first examined applicable law:

> Certainly, the petitioner has a well-recognized right under the Sixth Amendment of the Constitution to effective counsel. Counsel's performance will be evaluated by reviewing courts under the familiar test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
>
> Under the standard set out in Strickland and the Louisiana case of State v. Washington, 491 So.2d 1337 (La. 1986), a conviction must be reversed if the defendant proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced the defendant to the extent that the trial was rendered unfair and the verdict suspect. State v. Legrand, 2002-1462 (La.12/3/03), 864 So.2d 89.
>
> To be successful in arguing ineffective assistance of counsel, a post-conviction applicant must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment. A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted. Both pongs of the Strickland test must be established before relief will be granted.
>
> There is a strong presumption that counsel's performance is within the wide range of effective legal

representation. As observed in State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075, effective counsel does not mean errorless counsel. Furthermore, the reviewing court does not judge counsel's performance based on hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. In order to prevail on his claim of ineffective assistance of counsel, the petitioner must show *both* a constitutionally deficient performance and prejudice.

State v. Lewis, No. 01-4930 (24th Judicial District Court, December 18, 2007) (unpublished opinion) (emphasis original).[9]

Thereafter, the court rejected petitioner's claim of ineffectiveness based upon its finding that petitioner had not met his above-described burden of proof. Specifically, with regard to petitioner's claim that counsel was ineffective due to his failure to call alibi witnesses, the state district court observed that petitioner failed to attach any affidavits of these alleged witnesses regarding what they would have stated under oath if called to testify at petitioner's trial.[10] Further, the court noted that

---

[9]A copy of the district court's unpublished December 18, 2007 opinion is contained in the State rec., vol. 5 of 14, tab 5.

[10]In connection with his appeal of the state district court's adverse opinion on post-conviction, petitioner submitted affidavits from Sharon Wilson, Robert Henry, Booker Dunmore, and Damita Dunmore. Each of these affidavits were dated "12/11/2007" and provided the same information, namely, that petitioner was in Baton Rouge on September 14, 2001, the date the murder took place. (Copies of the affidavits are contained in the State rec., vol. 14 of 14, tab 12). The Louisiana Fifth Circuit Court of Appeal, however, denied petitioner's writ application, finding that the trial court "correctly found that relator did not meet his burden of proof on his ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d

24

petitioner failed to attach an affidavit from counsel acknowledging that he was informed of the existence of alibi witnesses, but failed to may an effort to call these witnesses to testify at trial.

With regard to counsel's alleged ineffectiveness in failing to investigate the existence of "Chief" and "Hicks", two names which the victim allegedly used in referring to the men who later murdered him, the court noted the two attorneys who handled the trials for co-defendants, Sturgis and Weaver, likewise failed to present any testimony regarding the alleged additional perpetrators. This fact clearly leads to the conclusion that no such testimony was procured not because all three attorneys were deficient, but rather, because no additional perpetrators existed. As for the nicknames of "Red" and "Dough Boy", it was established, as the Louisiana Fifth Circuit noted, that "Red" referred to petitioner's co-defendant, Clayton Weaver, and "Dough Boy" was a nickname for petitioner. Lewis, 917 So.2d at 594. Thus, an investigation as to who Sturgis was referring to when he used these nicknames was not necessary.

This court finds that the determination of both the state district and appellate courts that petitioner failed to satisfy his

---

674 (1984)." State ex rel. Peter Lewis v. Burl N. Cain, No. 08-KH-0050 (La. App. 5 Cir. Mar. 14, 2008) (unpublished opinion). (A copy of the state appellate court's March 14, 2008 unpublished opinion is contained in the State rec., vol. 14 of 14, tab 11).

burden of proof does not represent an unreasonable application of

Strickland's two-part test to the facts of this case.  Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the petition of Peter Lewis

for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be

**DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the

proposed findings, conclusions, and recommendation in a magistrate

judge's report and recommendation within fourteen (14) days after

being served with a copy shall bar that party, except upon grounds

of plain error, from attacking on appeal the unobjected-to proposed

factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such

consequences will result from a failure to object.  28 U.S.C.

§636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415,

1430 (5th Cir. 1996)(en banc).[11]

New Orleans, Louisiana, this 19th day of _____August_____, 2010.


Alma L. Chasez
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

_____

[11]Douglass referenced the previously applicable ten-day period for the
filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was
amended to extend that period to fourteen days.

26